Defendants contend to the Full Commission that the Deputy Commissioner should not have ruled "on the issue of medical compensation for psychological care", because the "defendants did not have the opportunity to obtain" evidence on the issue and that "in fact, the parties agreed that the issue would not be addressed". No stipulation to that effect appeared in written pretrial materials or the prehearing colloquy in the transcript, and plaintiff's reply brief does not directly address this. But whatever discussions counsel may have had off the record should not inhibit the Commission's ruling following this hearing held for the purpose of determining liability and benefits, and medical compensation in particular. In light of frequent references to plaintiff's hospitalization for alcoholism in medical records going back to 1992; recognition of plaintiff's chronic pain situation since the spring of 1993, due to disk reherniation and/or surgical scarring, treated with narcotic medication by defendants' witness, Dr. Sweet; and, referral by defendants' assigned rehabilitation nurse to a clinical psychologist in April of 1993 for treatment that continued until shortly after the hearing, we do not believe the defendants were unfairly surprised by the issue. According to post-hearing arguments filed by the parties, defendants terminated payment for the psychological treatments only then. The psychologist testified in a deposition prior to the hearing before the deputy commissioner that his treatment was necessitated by "an adjustment reaction to the injury and the subsequent problems she was having due to her injury [and] her physical dysfunction and pain, as well as the conflict she was in with her providers over her treatment." If defendants have a good faith basis for contending that the circumstances shown by this evidence have changed, they may contest their continuing obligation for this treatment. However, the greater weight of the evidence indicates that it is reasonably necessary in this case, and thus a part of the continuing medical compensation, which is routinely awarded when liability is found. A compensation party does not have the right to insist on litigating its case piecemeal. Hall v. Thomason Chevrolet Co.,263 N.C. 569, 577, 139 S.E.2d 857 (1965).
The closer question is whether plaintiff is entitled to additional temporary total compensation, which was actually paid through January 12, 1994. While it is unusual for surgical back patients to regain wage earning capacity before reaching maximum medical improvement, it is certainly possible. See, e.g., Beardv. Blumenthal Jewish Home, 87 N.C. App. 58, 59, 359 S.E.2d 261
(1987). The greater weight of medical opinion of record establishes that plaintiff was physically capable of sedentary work by mid-November of 1993. The plaintiff herself did not claim that discomfort would keep her from taking the sedentary jobs found for her. Tr., p. 66. But, as the Deputy Commissioner found, due to the sequence of events, the Form 24 was improvidently granted for failure to accept offered "sedentary" work. However, by November 22, 1993, plaintiff was made aware that sedentary jobs were available in the job market, and her family and treating physicians both approved the sedentary security officer position offered as an appropriate type of employment for plaintiff. Despite this, she did not, within a reasonable time thereafter — i.e., November 22, 1993 and January 12, 1994 — begin seeking employment. We agree with the Deputy Commissioner that this evidence rebuts the presumption of continuing disability. Thereafter, without a showing of further disability, she was not entitled to temporary total disability compensation. Burwell v. Winn-Dixie Raleigh, 114 N.C. App. 69,73-74, 441 S.E.2d 145 (1994); Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 425 S.E.2d 454 (1993).
This Award is the fifth Commission order that the defendants to pay for the additional back surgery recommended by several highly qualified physicians. While most of these doctors would do some additional assessment in preparation for surgery, defendants could rely only on the opinion of the original surgeon — whose treatment was inadequate to resolve the problem, for whatever reasons (Depo of Dr. Wheeler, p. 32) — for the proposition that no further surgery could help relieve her pain. By now, inadequate treatment, the frustration of this litigation, and chronic pain have complicated the plaintiff's medical course and increased the defendants' liability. Deposition of Dr. Henshaw p. 24, 26 and 28-30. The facts of this case place it within the Commission's discretion to award a reasonable attorney's fee for the plaintiff as a portion of the costs taxed against the defendants, and we need not decide whether that liability or their respect for the initial surgeon's opinion was the motivation for defendants' continuing appeals. N.C. Gen. Stat. § 97-88. The parties appeals were received at the Commission by mail on consecutive days — defendants' appeal was not triggered by plaintiff's — and the latter's argument was animated by her untreated complaints. In light of the medical evidence (to which defendants had substantial access prior to the formal depositions), the previous opportunities defendants have had to present their position, and the consistent results, we find that the ends of justice would best be served by shifting the costs that these proceedings have imposed on plaintiff to the parties that demanded them. Taylor v. J.P. Stevens Co., 307 N.C. 392,397, 298 S.E.2d 681 (1983). In addition to those traditional grounds for exercising this discretion, this is one of those unusual cases in which the Award does not provide the opportunity for our archetypical approval of an attorney fee to be paid out of indemnity compensation due. This case involves primarily medical compensation. In such cases, the imperative of allowing plaintiff's access to counsel when necessary to vindicate every legitimate right to compensation may override other important policy considerations. Church v. Baxter Travenol Laboratories, I.C. No. 808478, 26 July 1990, aff'd, 104 N.C. App. 411, 416,409 S.E.2d 715 (1991).
While, again, we offer no judgment on the state of mind of defendants' claims handlers in this case, cases like these often raise suspicions in the minds of even charitable observers about "adjusters practicing medicine". Because of the very significant decisions affecting treatment that adjusters may legitimately make, the distinction between these and medical decisions have become blurred in the minds of some. Consequently, we wish to make abundantly clear that compensation defendants and those acting on their behalf have absolutely no authority to determine, withhold or alter treatment of an accepted compensable condition recommended by claimant's treating physician (s), unless that decision is based on the contrary expert opinion of a person licensed under Chapter 90 of the N.C. General Statutes to diagnose and treat the condition. Subject always to the Commission's orders and awards, defendants may determine whether they are liable for a particular accident or a particular condition suffered by a claimant that has had a compensable accident; may select the healthcare providers to take charge of the claimant's care and determine and render appropriate services; may, in non-emergency circumstances, delay proposed treatment for a reasonable time to obtain a second opinion on proposed treatment from another qualified provider; may require pre-authorization (or "pre-certification") by qualified providers or persons under their supervision pursuant to N.C. Gen. Stat. § 97-25.3; and, may contract with a qualified Managed Care Organization to fulfill their obligation to provide care that will affect a cure, give relief, and shorten the period of disability, per N.C. Gen. Stat. §§ 97-2 (19) and 97-25.2. These perogatives — particularly choice of the physician to take charge of the case — protect the legitimate interests of the employer and its insurer, but do not permit interference with appropriate treatment for the purpose of financial or litigation advantage.
Consequently, upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except as noted herein, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner with the MODIFICATION of the Deputy Commissioner's Finding (s) of Fact 5, 8, 9, 16, and 17; Conclusion (s) of Law 1-5 and 6; and Award 1-3; other minor changes; and the addition of the Full Commission's Finding of Fact 8 and Award 3, as follows:
The following were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. The parties stipulated that a surveillance video marked as Stipulated Exhibit No. 1 may be received into evidence.
2. The parties stipulated that the records of the Rehab Center may be stipulated into the record.
3. The parties entered into an Agreement for Compensation Disability (Form 21) on December 4, 1992. The Form 21 was approved by the Industrial Commission on January 11, 1993. The Form 21 is incorporated into the record of this hearing. Pursuant to the provisions of the Form 21 the plaintiff sustained a compensable back injury arising out of and in the course and scope of her employment on November 23, 1992 and became temporarily totally disabled as a result of said accident on December 1, 1992. Commencing December 1, 1992 the plaintiff received compensation at the rate of $184.01 per week based upon an average weekly wage of $276.00. The plaintiff continued receiving temporary total disability compensation pursuant to the Form 21 Agreement until the approval by the Industrial Commission of the defendants' Application to Stop Payment of Compensation (Form 24). The Form 24 was approved by the Industrial Commission on January 12, 1994. The defendants paid the plaintiff 52 weeks of compensation, namely from November 24, 1992 to November 22, 1993. [It appears that, in fact, compensation continued through January 12, 1994.]
4. This hearing was requested by plaintiff for an appeal of the Industrial Commission's ruling approving the Form 24.
5. Plaintiff filed a Form 33, Request for Hearing, dated March 8, 1994, appealing the approval of Form 24 and seeking medical treatment from a doctor of plaintiff's choice. Defendants subsequently filed a Form 33R, Response to Request for Hearing. Executive Secretary Nick P. Davis filed an Order on July 18, 1994, permitting the defendants to obtain plaintiff's deposition prior to the hearing. Executive Secretary Davis filed an Order on July 29, 1994, granting plaintiff's request that Dr. Chapman perform fusion surgery at L4-5 and denying plaintiff's request for defendants to pay for breast reduction surgery. On August 8, 1994, Executive Secretary Davis ordered that the defendants could proceed with the plaintiff's deposition, and reaffirming the Order of July 29, 1994. On August 29, 1994, Chief Deputy Commissioner Dianne C. Sellers denied the defendants' Motion to postpone surgery scheduled for August 29, 1994, and for an expedited hearing on the issue of the need for surgery. Defendants appealed the Order of Chief Deputy Commissioner Sellers and refused to authorize surgery pending disposition of the appeal. At the hearing, defendants filed a written request for approval of a Pentothal pain study and plaintiff opposed the request.
6. Subsequent to the hearing, on November 10, 1994 plaintiff's counsel made a motion to the deputy commissioner to add a new issue to the hearing and to bifurcate the issue to be heard at some later date. The new issue which plaintiff seeks by motion to add is whether or not the plaintiff is entitled to pursue psychological counseling to be paid for by the defendants. [The motion was filed in reaction to defendants' post-hearing refusal to pay for additional counseling.]
* * * * * * * * * *
Based upon the competent credible evidence of record, the Full Commission makes the following
FINDINGS OF FACT
1. The plaintiff was born November 25, 1955 and has completed the ninth grade. The plaintiff sustained a compensable injury by accident on November 23, 1992 when she was lifting a roll of fabric and strained her back. The plaintiff was working as an inspector earning an average weekly wage of $276.00 with a compensation rate of $184.01.
2. As a result of plaintiff's compensable injury by accident, she received temporary total disability compensation pursuant to a Form 21 Agreement negotiated with the assistance of Attorney Fred Stann, whom the plaintiff subsequently discharged. Plaintiff received temporary total disability compensation from November 24, 1992 through January 12, 1994, the date a Form 24 was approved.
3. As of the time the plaintiff was injured she had been working for the defendant for nine weeks as an inspector. Her job involved picking up cloth and placing it on the knitting machines and taking cloth off of spools, stretching it out, inspecting the cloth and picking up the cloth, bagging and weighing it.
4. The plaintiff had previous job experience as a waitress, a bartender, a textile worker, and in work for a graphic company.
5. The plaintiff had a prior history of alcoholism, but she stopped drinking on or about March 10, 1991. After suffering her injury by accident and being seen at First Health in Belmont, the plaintiff was referred to Dr. Raymond Sweet, a neurosurgeon, on November 24, 1992. Diagnostic tests were performed and an MRI had shown a ruptured disc at the L4-5 level on the left, so Dr. Sweet, on December 4, 1992 performed a hemilaminectomy and a discectomy. He also prescribed Percocet for pain. However, on December 15th, plaintiff stated she had lost her Percocet prescription. She had had a Percocet prescription filled on November 24, 1992, and Dr. Sweet had written prescriptions on December 2, 1992 and on December 12, 1992. Dr. Sweet thought that the plaintiff's behavior indicated an addictive personality, and he was afraid that the plaintiff was going to become addicted to the Percocet that he prescribed. Dr. Sweet explained to plaintiff that under the circumstances he could not write anymore Percocet prescriptions and prescribed Darvocet. Post-surgery, plaintiff continued to complain of pain in her back and left leg. As of March 15, 1993, the plaintiff underwent a functional capacity evaluation which indicated that she was only able to perform sedentary work. A lumbar MRI was performed in April, with equivocal findings of recurrent central and left sided disk herniation at L4-5. Dr. Sweet reviewed the MRI and was of the opinion that the plaintiff had pain because of epidural adhesions plus trochanteric bursitis on the left. He opined that plaintiff was going to be, "A most difficult long term case and has had a history of alcohol abuse in the past."
6. Dr. Sweet was of the opinion that the plaintiff had reached maximum medical improvement as of June 21, 1993, that she could perform light duty work, so long as it did not involve repetitive bending, sitting for more than thirty minutes or lifting more than thirty pounds on an occasional basis, and he recommended work hardening. Plaintiff was referred to a doctor of her choice for a second opinion, Dr. Bruce Darden.
7. As of August 16, 1993, Dr. Sweet rated the plaintiff with a ten percent permanent partial disability of the spine. In October of 1993, Dr. Sweet discovered that the plaintiff was taking medications that she had obtained from her husband and was not taking pain medication that he prescribed, and he decided not to prescribe her further medications. At that particular time, Dr. Sweet was prescribing, as needed, Tylenol 3, Xanac and Dalmane, which was not to be taken with the Xanac. In November of 1993, he felt that the plaintiff could perform light duty without repetitive bending, crawling, climbing, or lifting more than twenty pounds, with no sitting or standing in one place for more than thirty minutes. On December 20, 1993, Dr. Sweet observed the plaintiff walk from her car through the parking lot into his office. He noted that she walked slowly, but was standing straight up and did not appear to be in a great deal of pain, but when she was in Dr. Sweet's examining room she walked stiffly and was bent over some ten degrees and groaned when walking. When Dr. Sweet observed the plaintiff, without her knowledge, walking back to her car, she did not appear to be in a great deal of distress. On that day it was Dr. Sweet's opinion that the plaintiff's complaints were far out of proportion to her physical and x-ray findings, and he reiterated difficulty controlling medications such that he did not want to prescribe for plaintiff again. Dr. Sweet opined that the plaintiff did not need further surgery, and he did not believe that there was a significant recurrent ruptured disc. Dr. Sweet did not feel like anything would improve the plaintiff's situation. Dr. Sweet reviewed the video that was admitted into evidence in this case and felt that the activities depicted on the video did not show the pain behavior that he had seen when he examined the plaintiff in his office on December 16, 1993. Dr. Sweet approved the security job that was offered to the plaintiff by Action Security, and he opined that she should be able to perform the security job based upon what he saw on the video.
8. On April 16, 1993, plaintiff first saw Dr. David Henshaw, a clinical psychologist. Dr. Henshaw testified in his deposition that plaintiff was referred by a rehabilitation nurse, Donna Morrow, who had been working with plaintiff at the request of the insurance carrier following the workplace injury of November 23, 1992. Dr. Henshaw diagnosed her with adjustment disorder with mixed emotional features. An adjustment disorder is a reaction to an identifiable psychological stressor with the onset of symptoms within about six months of the stressor's occurrence. Plaintiff's symptoms included anxiety, depression, anger, irritability and frustration which Dr. Henshaw opined had emerged as a result of her injury at work, and the sequelae of that. Dr. Henshaw also diagnosed a panic disorder without agoraphobia which was aggravated by her injury at work and the resulting stressors. Dr. Henshaw testified at his deposition on October 12, 1994, one week prior to the hearing before the deputy commissioner in this matter, that he had been treating plaintiff for the past one and one half years. Plaintiff's psychological treatment, including her treatment with Dr. Henshaw, is mentioned in some of plaintiff's medical providers' notes.
9. The plaintiff was examined by Dr. William Griffin on April 28, 1993, and seen on a brief follow-up visit on May 27, 1993, following plaintiff's complaints of "increasing discomfort" beginning the first week in April. He determined that an MRI done on April 12, 1993 "showed a significant disc bulge at L4-5 on the left with surrounding scar tissue" resulting in "persistent pain". Dr. Griffin felt that the plaintiff indicated "a degree of symptom magnification" of her pain, but that this "did not rule out significant physical pathology at that time." He suggested further diagnostic studies, and without those, he had no opinion on whether the condition should be addressed through fusion surgery, breast reduction surgery, or otherwise. In addition, he suggested that the plaintiff could benefit from a good physical therapy and conditioning program. In addition to his own examination, Dr. Griffin based his opinion of her physical abilities on a functional capacity evaluation performed on March 15th 1993, which characterized her abilities as falling in the "sedentary category," found that she was not capable of performing her former job duties, and recommended that she be "enrolled in a chronic pain program . . . to improve her functional capacity capabilities and help her manage her pain". Dr. Griffin felt that none of the activities in defendants' videotape were inconsistent with his examination done a year before it was taken. He felt she could perform sedentary work when he last saw her, including the functions of the Action Security job, to the extent they were actually described in the job description given him.
10. Plaintiff saw Dr. Anthony Wheeler, a neurologist who does not perform surgery, in March and April of 1994. He reviewed the plaintiff's April 1993 MRI and believed that it indicated a disc bulge at the L4-5 level, but was unclear whether this was a recurrent disc herniation or scar tissue. He declined to provide plaintiff with a Percocet prescription because he did not have an ongoing treatment relationship with her. After reviewing tests, he opined on April 19, 1994 that the plaintiff's EMG results were normal, but myelogram results were compatible with recurrent disc herniation and scar tissue at L4-5, which causes a lot more pain than initial herniation because of nerve entrapment. Consequently, he referred her to Dr. Darden for consideration of surgery. Dr. Wheeler felt that decompressive surgery is indicated and that the plaintiff can do sedentary work. Dr. Wheeler suggested that the more conservative route should be taken first — that is, the decompression surgery — and if that doesn't work, there should be fusion surgery. Dr. Wheeler, however, is of the opinion that whatever surgery is indicated for the plaintiff, the plaintiff should be able to chose the doctor whom she trusts the most and treat with that doctor, in that her trust and faith in the doctor will be important to the outcome.
11. The plaintiff saw Dr. Bruce Darden, to whom she was referred by Dr. Wheeler. Dr. Darden felt that the plaintiff should have decompression nerve root surgery and possibly a discectomy, but would not consider a fusion. Dr. Darden viewed the surveillance video of the plaintiff and was of the opinion that the video did, to a certain extent, contradict the physical findings that he saw. Dr. Darden opined that a Pentothal pain study would be worth while in order to "filter out any conscious attempts to alter the physical test." Dr. Darden opined that the plaintiff could work and could perform the security guard job.
12. The plaintiff saw Dr. Todd Chapman on referral of Industrial Commission nurse Caroline Fortner. Dr. Chapman recommended a bone fusion and a breast reduction for the plaintiff. Dr. Chapman could not guarantee the fusions would take and that it would not need to be re-done at some later time. The plaintiff is a smoker, and Dr. Chapman noted that a patient who is a smoker has a longer healing process with the fusion than does a non-smoker, and this would be important in respect to plaintiff's case. He also noted that it takes four months longer generally to get someone back to work following a prop-graft fusion than a simple discectomy. Dr. Chapman was not in agreement with Dr. Darden's recommendation for a Pentothal pain study, since it was clear from the MRIs that surgery was necessary in any case. Dr. Chapman was of the opinion that plaintiff could try to perform the security guard job.
13. Plaintiff saw Dr. Craig Brigham of the Miller Orthopedic Clinic on June 20, 1994. Dr. Brigham diagnosed a recurrent herniated disc at L4-5 with a significant component of back pain and clear psychosomatic component to her illness behavior. Dr. Brigham indicated that the plaintiff had an inappropriate response to very light touch to the lumbar spine. Dr. Brigham recommended a fusion for the plaintiff, but indicated that the amount of pain relief would be harder to predict because she had been disabled so long and had inappropriate illness behavioral signs. Dr. Brigham noted that a smaller operation would perhaps be better in the plaintiff's case. Dr. Brigham did not think that breast reduction surgery was necessary for the plaintiff. Dr. Brigham was also of the opinion that, from a logistic medical standpoint, plaintiff could perform a sedentary security job.
14. The plaintiff has been seen by eight or more doctors and she has received therapy and psychological counseling. She was actually being prepared for fusion surgery when the carrier advised the surgeon that the procedure was not approved for payment, and the plaintiff's surgery was abruptly canceled. All of the circumstances surrounding the plaintiff's case have no doubt caused the plaintiff to have questions and fears concerning her medical treatment, and it is important, in the opinion of the undersigned as well as the opinion of many of the medical providers, that she be able to treat with the doctor of her choice in whom she places trust and confidence.
15. Based upon all of the medical testimony offered in this case, it is evident that the plaintiff has not reached maximum medical improvement and is in need of future medical treatment, inclusive of probable surgical procedures, including decompressive surgery, a discectomy, and/or fusion. The medical authorities consulted by the plaintiff, who were received as experts for the purpose of testimony in this case and regularly practice in cases handled before the North Carolina Industrial Commission, have indicated varying opinions with respect to plaintiff's diagnosis and future treatment, but it is apparent, and the undersigned hereby find, that the plaintiff will require future medical care, and that the plaintiff will best be served by being able to treat with the physician of her choice, who shall be free to perform such diagnostic, surgical and follow-up treatment procedures as deemed necessary, reasonable, and appropriate on behalf of the plaintiff for the purposes of effecting a cure, giving relief, or lessening the period of plaintiff's disability.
16. In the testimony of the numerous doctors who saw the plaintiff, made diagnoses, and gave opinions, a recurrent theme was that plaintiff could perform sedentary work. The undersigned hereby find that the plaintiff, as of late 1993, was able to perform sedentary work, such as the security officer job that was suggested for her.
17. The plaintiff was assigned a vocational specialist by defendant carrier, Ann Welch, who first met with the plaintiff on October 28, 1993 and thereafter attempted to locate jobs for the plaintiff. Ultimately, the potential job with Action Security was arranged. The evidence, however, is in conflict as to whether or not the job was in fact offered to the plaintiff as one would normally deem a job to be offered. The plaintiff has the right to expect that when a job is offered she will be told what the job involves, where the work is to be located, how much the job will pay, and what benefits, if any, are offered with the job. In this particular case, the plaintiff was first offered a security job at Toys R Us where she would have been required to carry a firearm. Plaintiff had no previous training with firearms and was in fact opposed to the use of weapons, and it would be unreasonable to expect that she would have to start carrying a firearm when she knew nothing about them. Another job within her restrictions was found at Action Security, but it appears from the evidence that, before the job was fully explained and fully offered to the plaintiff, plaintiff's vocational consultant was congratulating her for having gotten the job, when in fact it had not been approved by her treating physician, Dr. Sweet. It is reasonable to expect in a workers' compensation case, with someone recovering from surgery, on pain medication, and who has restrictions imposed upon them, that their treating physicians should be given the opportunity to determine if the job fits within the restrictions. In this particular case, no such communication was given to the plaintiff before she was informed that she had the job and would have to report to work. Dr. Sweet approved the job on November 22, 1993, after the fact of the alleged offer. The North Carolina Industrial Commission previously terminated the plaintiff's temporary total disability compensation of $184.01 per week by approving a Form 24 on January 12, 1994 because she failed to accept the job that was offered. The undersigned are of the opinion that the action on the Form 24 should be reversed because all of the evidence surrounding this job offer fails to establish that there was a clear cut, above board job offer, or that the plaintiff knew and understood what the job would involve. The evidence does not establish whether or not the new job would have paid her a wage equal to or greater than her average weekly wage, nor does it establish any other aspect concerning compensation and benefits. Thus, the undersigned finds that the Form 24 was improvidently approved.
18. Even though the Form 24 should not have been approved, the weight of opinion among plaintiff's many examining physicians was that she could do sedentary work. The plaintiff was informed on November 18, 1993 that the security job was approved by her family doctor, Dr. Anthony. After the fact of the alleged job offer, the job was approved by her treating physician, Dr. Sweet, and plaintiff was aware by November 22, 1993 that she could do sedentary work, and that sedentary jobs were available in the job market. The plaintiff should have reasonably sought work. However, the plaintiff made no effort to look for work. Thus, the undersigned find that even though the Form 24 approval should be set aside, the defendants' obligation to pay temporary total disability compensation should nonetheless be terminated as of January 12, 1994 (when payments, in fact, were stopped), because of plaintiff's failure to seek employment when she was able to do sedentary work, was made aware that jobs within her restrictions were actually available to her, and had a reasonable period of time to seek employment, but made no effort to do so. Plaintiff was not thereafter disabled by the subject compensable injury.
19. The plaintiff initially consulted with Attorney Fred Stann and retained him to represent her in this workers' compensation case. Attorney Stann was instrumental in the negotiation of plaintiff's Form 21 Agreement, and signed said Agreement with his client on or about December 4, 1992. Thereafter Attorney Stann petitioned the North Carolina Industrial Commission for an award of a fee in this case, and a fee of 20% of the plaintiff's compensation was approved and allowed for Attorney Stann by Nick P. Davis, the Executive Secretary of the North Carolina Industrial Commission, to be paid by the payment of every fifth check for compensation directly to Attorney Stann. In January of 1994 the plaintiff dismissed Attorney Stann as her attorney. Pursuant to the prior award of an attorney's fee for Attorney Stann, he was entitled to 20% of the compensation paid to plaintiff from November 24, 1992 through January 12, 1994.
* * * * * * * *
The above findings of fact and conclusions of law engender the following additional
CONCLUSIONS OF LAW
1. As a result of her compensable injury by accident on November 23, 1992, the plaintiff has required continuing medical care, including surgery, and is in need of and is entitled to medically recommended additional surgery, whether decompressive surgery, discectomy, or fusion. N.C.G.S. §§ 97-2 (6) and 97-25.
2. The plaintiff has not reached maximum medical improvement as a result of her compensable injury by accident, and it is likely that the plaintiff will have additional surgery. Crawleyv. Southern Devices, Inc., 31 N.C. App. 284, 288-89,229 S.E.2d 325 (1976), cert denied, 292 N.C. 467, 234 S.E.2d 2 (1977), N.C.G.S. § 97-31.
3. Even though the Form 24 was improperly approved, and is hereby set aside, plaintiff is not entitled to temporary total disability compensation beyond January 12, 1994, because she had regained the capacity to earn wages, but did not make a reasonable effort to find employment. However, if plaintiff is temporarily and totally disabled for any period following the hearing before the Deputy Commissioner due to the compensable injury, in connection with the above-referenced medical compensation or otherwise, she is entitled to temporary total disability compensation of $184.01 per week for such period. I.C. Rule 404 (1992); N.C.G.S. § 97-29; Burwell v. Winn-Dixie Raleigh,114 N.C. App. 69, 73-74, 441 S.E.2d 145 (1994).
4. The plaintiff is entitled to choose the treating physician, including either Dr. Chapman or Dr. Darden, in whom she has trust and confidence. Consequently, plaintiff's treating physician of choice is authorized to pursue such course of treatment, inclusive of any of the referenced physicians' proposed surgeries, as said physician deems necessary and appropriate to give the plaintiff relief, effect a cure, or to lessen the period of disability for the consequences resulting from the plaintiff's compensable injury by accident. N.C.G.S. § 97-2 (19) and 97-25.
5. Attorney Fred Stann is entitled to the payment of an attorney fee of 20% of the compensation paid to plaintiff from November 24, 1992 to January 12, 1994 for valuable services rendered. N.C.G.S. § 97-90 (c).
6. Plaintiff's current attorneys are entitled to an award for valuable services rendered since January 12, 1994 of a reasonable attorney's fee, to be taxed to the defendants as a portion of the costs. N.C.G.S. §§ 97-90 (c); 97-88.
* * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. The defendants shall pay all medical compensation expenses incurred by the plaintiff as a result of her compensable injury by accident of November 23, 1992 when bills for the same have been presented to the carrier and approved for payment in accordance with the rules of the Commission, including statements for services rendered by Drs. Henshaw, Griffin, Wheeler, Darden, Chapman and Brigham. It is further ORDERED that the plaintiff may select either Dr. Bruce Darden or Dr. Todd Chapman to undertake and direct her medical care, and defendants shall pay all medical compensation expenses incurred under said doctor's orders, including charges for diagnostic testing, surgical procedures, and therapies for pain made necessary by plaintiff's compensable back injury and delays in providing suitable treatment.
2. Plaintiff's claim for additional total disability benefits in respect to periods prior to the hearing before the Deputy Commissioner, the defendants' motion for a "pentothal pain study", and plaintiff's motion to reopen the record for an additional hearing are, in accordance with the foregoing, DENIED.
3. A reasonable attorney fee of 20% of the compensation paid to the plaintiff from November 24, 1992 through January 12, 1994 is hereby approved for Attorney Fred Stann for valuable services to plaintiff. Any payments heretofore received by Attorney Stann shall be credited against said attorney's fee, and any unpaid balance shall be paid to Attorney Stann out of indemnity benefits which may become due pursuant to this award.
4. The Commission will approve a reasonable attorney fee for services heretofore rendered by plaintiff's current counsel when presented with a petition concerning their time and services.
5. The defendants shall pay the costs, including the attorney fee to be approved for plaintiff's current counsel.
 S/ _________________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING
S/ _________________________ LAURA K. MAVRETIC COMMISSIONER
S/ _________________________ JAN N. PITTMAN DEPUTY COMMISSIONER
JRW/jss/md